BROWN, Circuit Judge,
dissenting in part.
With only minor hesitation,[1] I join the majority’s analysis of the district court’s jurisdiction over Omar’s habeas petition. But I disagree with the majority’s view that, while the district court cannot enjoin Omar’s release outright, it may indeed dictate the terms of his release. Hence, I write separately to explain why I would vacate the district court’s injunction.
I
This case reached us when the government appealed the district court’s Order dated February 13, 2006. The sole question before us, then, is whether that Order was proper. In relevant part, it states as follows:
[It is] ORDERED that the motion for a preliminary injunction is GRANTED, and it is
FURTHER ORDERED that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, shall not remove the petitioner from United States or MNF-I custody, or take any other action inconsistent with this court’s memorandum opinion.
The Motion for a Preliminary Injunction referenced by the Order was originally styled a Motion for a Temporary Restraining Order, and it asked the court to prevent “the transfer of Shawqi Omar to the authority of any other government, sovereign, country, or agency until this Court has an opportunity to consider and decide the merits” of Omar’s habeas petition.
The injunction, by its terms, grants the original Motion, thereby barring Omar’s transfer to different custodians. The injunction also explicitly instructs the respondents not to “remove [Omar] from United States or MNF-I custody,” an act necessary for his release.[2] Finally, the discussion in the district court’s memorandum opinion makes sense only if the court further intended to proscribe Omar’s presentation before the Central Criminal Court of Iraq (“CCCI”), even while he remained in the custody of the United States or MNF-I. The Order gives effect to this intention by enjoining “any other action inconsistent with this court’s memorandum *16 opinion.” In summary, the injunction bars Omar’s transfer to a foreign custodian, his outright release, and his presentation before the CCCI while within United States or MNF-I custody.[3]
II
In addressing the propriety of this injunction, I note first that we heard arguments in this case on the portentous date of September 11, 2006, precisely five years after the terrorist attacks that so fundamentally altered this country’s attitude toward security. No longer could we sit back and consider ourselves safe from foreign enemies so long as no other nation wished us harm. The Founders envisioned wars in the paradigm of the time, with official declarations from heads of states announcing the beginning and end of hostilities. In today’s world, by contrast, global alliances of non-state actors can visit death and destruction on the American homeland without warning, on a scale equal to that seen in conventional wars. In such an environment, it would be dangerous folly to deny what this case involves: the capture of an alleged enemy combatant by American military personnel operating in a war zone. It is in this context that we must measure Omar’s likelihood of succeeding in his habeas petition, the harm the injunction imposes on the respondents, and the interest of the public in the case.[4]
While the test for preliminary injunctions is a flexible one — a strong showing on the merits may compensate for a relatively slight showing of irreparable injury — a petitioner must nonetheless demonstrate “some injury.” CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C.Cir.1995) (internal quotation marks omitted) (quoting Population Inst. v. McPherson, 797 F.2d 1062 app. at 1078 (D.C.Cir.1986)). Specifically, we ask whether the petitioner “would suffer irreparable injury if the injunction is not granted.” Id. at 746. Thus, if the injunction would not reduce the risk of the feared injury — whether because the injury would not occur even absent the injunction or because it would remain equally likely even with the injunction in place — the injunction should not be granted. In particular, when the feared injury is the loss of a remedy the petitioner seeks from the courts, we must determine whether the action to be enjoined would preclude or impair the desired relief, and, if so, whether the petitioner is likely to obtain that relief on the merits.
To state this rule is to demonstrate immediately that the injunction should be vacated at least to the extent it operates to bar Omar’s release. Release would provide Omar with all the relief to which he *17 might be entitled by way of his habeas petition. While courts do have power to grant equitable habeas remedies beyond mere release, Omar has demonstrated no grounds whatsoever for such remedies. Equitable remedies typically involve either an order to a custodian to ameliorate the conditions of a petitioner’s detention, e.g., Miller v. Overholser, 206 F.2d 415 (D.C.Cir.1953), or an order freeing a petitioner from penalties resulting from conviction that persist beyond the end of detention, e.g., Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). Release from detention trumps ameliorated detention, and Omar has pointed to no statutory penalties that would persist after his release. Cf. Lane v. Williams, 455 U.S. 624, 631-33, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) (limiting the Carafas exception to “civil disabilities” imposed on former detainees by operation of law). Thus, if Omar prevails on his habeas petition, he would be released and nothing more, and release at this early stage of the proceeding would only accelerate that relief, not impair it. In such circumstances, the district court’s action blatantly violates the rule that injunctions must be “narrowly tailored to remedy the harm shown.” Nat’l Treasury Employees Union v. Yeutter, 918 F.2d 968, 977 (D.C.Cir.1990).
Similarly, the bar on Omar’s presentation before the CCCI while in United States custody is improper. Provided such presentation does not hamper the ability of the government to order Omar’s release should the district court rule in his favor, it presents no impediment to relief Omar might receive. While it might be argued that conviction by the CCCI would prevent Omar’s release, the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such non-reviewable adjudications. Cf. Hirota v. MacArthur, 338 U.S. 197, 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948); Neely v. Henkel, 180 U.S. 109, 123, 21 S.Ct. 302, 45 L.Ed. 448 (1901).
Omar concedes the district court cannot enjoin his release, see Appellees’ Br. 47, and his briefs before us barely address the bar on his presentation before the CCCI. However, Omar dedicates much more energy to his argument that the remaining portion of the injunction — the bar on his transfer to a new custodian — should be enforced. The propriety of this part of the injunction is unquestionably the closest question before us.
If this portion of the injunction stands by itself, then the government will be permitted to release Omar, but not to transfer him to Iraqi control. But just how far may the courts go in effectuating such an order? Because Omar seeks an injunction against his transfer to Iraqi authorities, we have to assume that the United States seeks to transfer him to Iraqi authorities and that Iraqi authorities seek to gain custody. Therefore, if the government simply releases Omar and allows him to walk out of Camp Bucea, he might well find a dozen armed Iraqi soldiers waiting for him. This possibility becomes an inevitability if United States military officials notify Iraqi authorities as to the exact time and place of Omar’s release, thereby effectively ensuring his immediate recapture and detention. The majority calls this reasoning speculative, but it is precisely the sort of consideration of future likelihoods that is required of a court when it weighs the propriety of preliminary relief. CityFed, 58 F.3d at 746. In short, the practical effect of Omar’s release with a tip-off to Iraqi authorities would be indistinguishable from his formal transfer to those authorities. Therefore, absent a limitation on intergovernmental communication, an *18 injunction against transfer will have no significant effect on the likelihood of Omar’s detention by Iraq subsequent to his release from United States custody.
But information sharing among sovereigns regarding the location of persons subject to arrest is a common and desirable practice, particularly in a situation like that in present-day Iraq, where the United States military is cooperating with Iraqi authorities to secure the country. Any judicial order barring this sort of information sharing in a military zone would clearly constitute judicial interference in a matter left solely to Executive discretion and would hence be improper under the political question doctrine. See Hamdi v. Rumsfeld, 542 U.S. 507, 531, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion) (“Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.”); cf. Bancoult v. McNamara, 445 F.3d 427, 436-37 (D.C.Cir.2006); Schneider v. Kissinger, 412 F.3d 190, 193 (D.C.Cir.2005). Thus, the courts are powerless to enjoin the United States from informing Iraqi officials about the planned release of Omar, and under these circumstances, an injunction against outright transfer is an empty gesture that cannot be sustained. See CityFed, 58 F.3d at 746.
The majority recognizes the practical equivalence between transferring Omar and “ ‘releasing’ him with a wink-and-a-nod to the Iraqis,” Maj. Op. 13, but draws the opposite conclusion. The majority’s logic proceeds as follows: (1) An injunction barring transfer is permissible. (2) Unrestricted intergovernmental communication could convert release into transfer. (3) Therefore, federal courts must have the power to limit intergovernmental communication, in order to give effect to the main injunction against transfer. Summarizing its position, the majority declares: “The United States may certainly share information with other sovereigns ..., but it may not do so in a way that converts Omar’s ‘release’ into a transfer that violates a court order.” Id. This is a striking conclusion. The majority in effect holds that, in the proper circumstance, a single unelected district court judge can enjoin the United States military from sharing information with an allied foreign sovereign in a war zone and may do so with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil, in effect secreting a fugitive to prevent his capture. The trespass on Executive authority could hardly be clearer.
Ill
To obtain injunctive relief, the moving party “must demonstrate 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.” CityFed, 58 F.3d at 746. The first two factors clearly favor the government here, and the district court’s findings in favor of Omar on the remaining two factors are dubious at best.
With regard to the first factor — Omar’s likelihood of succeeding on the merits — we must first determine in what sense he must be likely to succeed. It may be true that he is likely to succeed on the merits if all he seeks from his habeas petition is release with no additional protections, but then the United States would be free to notify Iraqi officials of the time and place of his release, effectively ensuring Iraqi detention. Omar’s “success on the merits,” in that case, would be Iraqi detention, and an injunction against transfer would *19 not be necessary. Therefore, to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, Omar would need to show some likelihood of obtaining permanent relief protecting him from Iraqi custody. This remedy we might call “release plus,” consisting of release combined with immunity to Iraqi prosecution, release following surreptitious transport out of Iraq, or release with a promise to conceal the time and place of the release. But Omar has asserted no legal grounds justifying such an extraordinary remedy, and even had he done so, it would be beyond the court’s power to grant. Imposing such conditions on Omar’s release would substantially interfere with the Executive’s prerogative, especially in time of war. Thus, the first factor favors the government.
In an attempt to show that the district court’s bar on Omar’s transfer to the Iraqi authorities would indeed secure Omar’s chance at some better outcome on the merits, the majority draws an analogy between that injunction and garden-variety stays on extradition. See Maj. Op. 12. As the majority notes, “transferring a petitioner to the foreign country seeking extradition is obviously not the same as releasing him.” Id. But Omar is physically detained in Iraq. Therefore, transfer in this context is not akin to extradition. Cf. Ntakirutimana v. Reno, 184 F.3d 419 (5th Cir.1999); Then v. Melendez, 92 F.3d 851 (9th Cir.1996). Rather, “transfer” here means simply allowing Iraqi officials to arrest and take custody of a person who was captured in Iraq and has remained there continuously — something they undeniably have a right to do. “A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction,” Wilson v. Girard, 354 U.S. 524, 529, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957),[5] and American citizenship is not a grant of immunity to commit crimes in other countries with impunity, Neely, 180 U.S. at 123, 21 S.Ct. 302. As noted, the majority’s holding has the remarkable effect of enabling a court sitting in Washington, D.C., to block the efforts of a foreign sovereign to make an arrest on its own soil. Where, as is true here, the prisoner is physically in the territory of the foreign sovereign that seeks to make the arrest, release is tantamount to transfer, and thus the logic underlying stays on extradition does not apply. The majority’s contrary view is comparable to a court enjoining state authorities from lodging a detainer with respect to a prisoner held in federal custody and then requiring the federal prison officials to release the prisoner in a way that protects the prisoner from state arrest. Such interference by a court in the decisions of sovereigns acting jointly within the same territory is unprecedented. Cf. Floyd v. Henderson, 456 F.2d 1117, 1119 (5th Cir.1972) (“[The state prisoner] could not complain about being returned [from state custody] to federal prison, because the question of jurisdiction and custody over a prisoner is one of comity between *20 governments and not a personal right of the prisoner.”).
The second CityFed factor, the risk of “irreparable injury” to Omar if the injunction is not granted, likewise favors the government. Irreparable injury must be measured in terms of the relief the litigant ultimately seeks, and as outlined above, the preliminary injunction against transfer does not alter in any way the likelihood Iraqi authorities will take Omar into custody if he ultimately prevails on the merits of his petition and gains his release from United States custody. Thus, the claimed “irreparable injury” (Iraqi custody) is not different from the most likely consequence of the relief Omar is pursuing. Only if Omar is seeking not just release, but release with protection from Iraqi custody, can he argue transfer to Iraqi authorities poses a threat of irreparable injury. But as noted, Omar has not established any legal basis for protection from Iraqi custody.[6] It simply defies logic for a court to conclude Omar needs a preliminary injunction to protect him from the consequences of the relief he is ultimately seeking. Similarly, while the district court treated loss of habeas jurisdiction as a second irreparable injury, this is truly injurious only to the extent the exercise of jurisdiction might produce relief beyond release into Iraqi custody, and (once again) no such additional relief could be warranted.
The third factor queries the injuries other parties might sustain as a result of the injunction. Here, the substantial impairment to the Executive’s ability to prosecute the war efficiently and to make good on its commitments to our allies cannot be denied. Given the gravity of such impairment in these troubled times, the third factor places much on the government’s side of the ledger.
Finally, the fourth CityFed factor asks the district court to weigh the balance of public interest. The same concerns raised by the third factor apply here and render suspect a finding that, in the present environment, the balance of public interest favors limiting Executive discretion to transfer Omar.
The district court couched its analysis in terms of the CityFed factors but followed an entirely different path. The court did not address the merits of Omar’s underlying habeas claim or discuss what relief would justify each portion of the injunction. Rather, the court merely determined that it might have jurisdiction over Omar’s habeas petition and then deemed this possibility sufficient to satisfy the first CityFed factor. Omar v. Harvey, 416 F.Supp.2d 19, 23-28 (D.D.C.2006). Addressing the second factor, the court treated its potential loss of jurisdiction as an irreparable injury without explaining how its retention of jurisdiction could provide Omar with relief that would somehow preclude his being taken into Iraqi custody. Id. at 28-29. Even assuming deference requires us to uphold the district court’s findings on the final two factors, see CSX Transp., Inc. v. Williams, 406 F.3d 667, 670 (D.C.Cir.2005), its analysis of the first two is clearly erroneous, and its overall weighing of the CityFed factors represents an abuse of discretion.
IV
I agree with the. majority that the district court has jurisdiction to entertain *21 Omar’s petition for a writ of habeas corpus. However, because each part of the district court’s injunction — the bar on Omar’s release, the bar on his transfer to a separate custodian, and the bar on his presentation before the CCCI while he remains in United States or MNF-I custody — is improper, I would vacate the injunction. Thus, in relation to however much of the injunction the majority affirms, I must respectfully dissent.

. To the extent the majority's opinion might be read to imply citizenship was one of the determinative factors in Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948), I note the question remains open in this circuit. Compare Flick v. Johnson, 174 F.2d 983, 984 (D.C.Cir.1949) (focusing on conviction by a foreign tribunal as the hallmark of Hirota without discussing citizenship), with Maj. Op. 6 (describing the issue in Hirota as "the availability of habeas to non-citizens convicted abroad by multinational tribunals”).

. The majority interprets this instruction as covering transfer but not release. Maj. Op. 11-12. Given such an interpretation, it is not clear why the district court had to "FURTHER ORDER[ ]" that Omar not be removed, when the court’s grant of Omar's Motion for a Preliminary Injunction already barred his transfer. However, since the majority finds that an injunction against release was not intended, and I find that it was intended but improper, we all agree that the United States is free to release Omar from custody.

. Indeed, as the government has recognized, the final portion of this injunction effectively bars Omar’s prosecution by the CCCI, as well. See Opp'n to Pet’rs' Emergency Mot. for In-junctive Relief at 18-19, Munaf v. Harvey, No. 06-5324 (D.C.Cir. Oct. 25, 2006) ("[Omar] has not yet had a trial or even an investigative hearing in the CCCI due to the district court’s unprecedented injunction in that case.”).

. Were this an isolated case, the district court’s cavalier approach to the difficult questions it presents would be less worrisome. But in fact several related cases have recently come before this court, with many more sure to follow. See, e.g:, AlBandar v. Bush, No. 06-5425, 2006 U.S.App. LEXIS 32239 (D.C.Cir. Dec. 29, 2006) (non-citizen seeking habeas after conviction in Iraq); Munaf, supra note 3 (U.S. citizen seeking habeas after conviction in Iraq). The proper contours of court jurisdiction in such cases remain unclear, as do the rights to be accorded the petitioners on the merits. In such circumstances, this court has a duty to provide clear guidance based on the cases presented for its consideration.

. To the extent the majority reads Girard as permitting in-country transfer of an American service member to foreign custody only if a treaty or similar international agreement provides for the transfer, see Maj. Op. 10, the majority misreads that opinion. In Girard, the Court did not describe any treaty or agreement providing for the transfer of the detainee, and it would be odd to hold that a foreign sovereign needs the authorization of an international agreement to take custody of someone detained in its own territory or that the United States needs such authorization to release the detainee in compliance with the foreign sovereign's wishes. Significantly, the Girard Court reversed an injunction against transfer very much like the one at issue here. Girard, 354 U.S. at 526, 530, 77 S.Ct. 1409.

. I do not make light of Omar's assertion he will receive severe treatment as a result of Iraqi detention. To recognize that our courts lack the authority to dictate the actions of a foreign sovereign is not to sanction human rights violations. As part of a tripartite system of government, we need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks.